No. 23-40555

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

Indigenous Peoples of the Coastal Bend; Karankawa Kadla Tribe of the Texas Gulf
Coast; Ingleside on the Bay Coastal Watch Association,

*Plaintiffs – Appellants,*

v.

United States Army Corps of Engineers; Scott A. Spellmon, Lieutenant General;
Christopher G. Beck, Brigadier General; Timothy R. Vail, Colonel,

*Defendants – Appellees,*

Enbridge Ingleside Oil Terminal, LLC, formerly known as
MODA Ingleside Oil Terminal, L.L.C.,

*Intervenor Defendant – Appellee.*

---

On Appeal from the United States District Court
for the Southern District of Texas, Corpus Christi Division

---

### BRIEF OF PLAINTIFFS – APPELLANTS

---

Lauren Ice
Marisa Perales
**PERALES, ALLMON & ICE, P.C.**
1206 San Antonio Street
Austin, TX 78701
(512) 469-6000

Robert B. Wiygul
**WALTZER WIYGUL & GARSIDE LLC**
1011 Iberville Drive
Ocean Springs, MS 39564
(228) 872-1125

*Counsel for Plaintiffs-Appellants*

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

| | |
|---|---|
| Indigenous Peoples of the Coastal Bend; Karankawa Kadla Tribe of the Texas Gulf Coast; Ingleside on the Bay Coastal Watch Association,<br>    *Plaintiffs – Appellants,*<br><br>v.<br><br>United States Army Corps of Engineers; Scott A. Spellmon, Lieutenant General; Christopher G. Beck, Brigadier General; Timothy R. Vail, Colonel,<br>    *Defendants – Appellees,*<br><br>Enbridge Ingleside Oil Terminal, LLC, formerly known as MODA Ingleside Oil Terminal, L.L.C.,<br>    *Intervenor Defendant – Appellee.* | § § § § § § § § § § § § § § § § § § |

No. 23-40555

The undersigned counsel of record certifies, pursuant to FED. R. APP. P. 26.1, that each plaintiff is a non-profit corporation, and as such, none of the plaintiff corporations have a parent corporation or any publicly held corporation that own 10% or more of its stock. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1) <u>**Plaintiffs – Appellants:**</u>

Indigenous Peoples of the Coastal Bend; Karankawa Kadla Tribe of the Texas Gulf Coast; Ingleside on the Bay Coastal Watch Association

**2) Defendants – Appellees:**

United States Army Corps of Engineers; Scott A. Spellmon, Lieutenant General; Christopher G. Beck, Brigadier General; Timothy R. Vail, Colonel

**3) Intervenor Defendant – Appellee:**

Enbridge Ingleside Oil Terminal, LLC, formerly known as MODA Ingleside Oil Terminal, L.L.C.

**4) Counsel for Plaintiffs – Appellants:**

Lauren Ice, Marisa Perales, Perales, Allmon & Ice, P.C.

Robert B. Wiygul, Waltzer Wiygul & Garside LLC

**5) Counsel for Defendants – Appellees:**

Arielle Mourrain Jeffries, U.S. Department of Justice Environment and Natural Resources Division

**6) Counsel for Intervenor Defendant – Appellee:**

Jeremy C. Marwell, Brandon M. Tuck, Vinson & Elkins L.L.P.

James E. Smith, Crain, Caton & James, P.C.

**7) Counsel for Defendants – Appellees in the underlying case:**

Jennifer B. Lowery, Acting United States Attorney, Lander B. Baiamonte, Assistant United States Attorney, U.S. Department of Justice

Todd Kim, Assistant Attorney General, Jacob D. Ecker, Elliot Higgins, U.S. Department of Justice Environment and Natural Resources Division

**8) Counsel for Intervenor Defendant – Appellee in the underlying case:**

Kelly D. Brown, Crain, Caton & James, P.C.

> */s/ Lauren Ice*
> Attorney of record for Plaintiffs-Appellants

## **REQUEST FOR ORAL ARGUMENT**

Plaintiffs – Appellants, Indigenous Peoples of the Coastal Bend, Karankawa Kadla Tribe of the Texas Gulf Coast, and Ingleside on the Bay Coastal Watch Association respectfully request oral argument. This appeal concerns complex issues involving the National Environmental Policy Act, Section 404 of the Clean Water Act, and the Corps' permitting regulations as they apply to the proposed expansion of the Moda Terminal. The Moda Terminal expansion involves the dredging of 3.9 million cubic yards of material from the Corpus Christi Bay in order to construct a new deep-water dock and create a new 1,700-foot-diameter turning basin for deep-water oil tankers, effectively doubling the existing vessel capacity at the Terminal. Plaintiffs believe oral argument of the facts and applicable law would benefit the Court.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

REQUEST FOR ORAL ARGUMENT ..................................................iv

TABLE OF CONTENTS ........................................................... v

TABLE OF AUTHORITIES ................................................. vii

GLOSSARY ............................................................ xiii

JURISDICTIONAL STATEMENT ..............................................1

STATEMENT OF THE ISSUES ...............................................1

STATEMENT OF THE CASE ................................................2

    I.    INTRODUCTION ...................................................2

    II.   STATUTORY BACKGROUND..................................4

       A.   National Environmental Policy Act ..........................4

       B.   The Clean Water Act ..................................7

       C.   The Corps' Permitting Regulations............................8

    III.  RELEVANT FACTS....................................9

    IV.  RELEVANT PROCEDURAL HISTORY ....................14

SUMMARY OF THE ARGUMENT .....................................16

ARGUMENT ......................................................18

    I.    STANDARD OF REVIEW .........................................18

    II.   PLAINTIFFS HAVE STANDING ............................19

    III.  PRE-2020 CEQ REGULATIONS CONTROL .........................23

IV.   THE CORPS ACTED ARBITRARILY AND CAPRICIOUSLY ...............25

A.   The Corps' impacts assessment is deficient. ...........................26

   i.   The EA fails to assess impacts from increased vessel traffic on seagrasses and on the neighboring community, as required by NEPA ... . .................................................................................26

   ii.   The Corps' impact assessment arbitrarily gives weight to benefits without assessing related costs. ..........................................37

   iii.   The EA fails to assess incremental impacts of the project.................38

   1.   Atchafalaya Basinkeeper *does not exempt the Corps from a meaningful cumulative impacts assessment.*..........................................38

   2.   *The EA fails to document, explain, or analyze the overall impact of accumulated individual impacts.* ......................................40

   iv.   The Corps' failure to assess cumulative impacts is a violation of CWA requirements.........................................................................47

B.   The Corps failed to take a hard look at the indirect and cumulative climate impacts of the Moda Terminal expansion. ................................50

C.   The Corps failed to prepare an EIS, as required by NEPA. ....................55

CONCLUSION ................................................................57

CERTIFICATE OF SERVICE.................................................58

CERTIFICATE OF COMPLIANCE ........................................59

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Atchafalaya Basinkeeper*,
   894 F.3d 692 (5th Cir. 2018) ............................................................38

*Bair v. Cal. Dep't of Transp.*,
   982 F.3d 569 (9th Cir. 2020) ........................................................4, 23

*Bark v. U.S. Forest Serv.*,
   958 F.3d 865 (9th Cir. 2020) ............................................................43

*Border Power Plant Working Group v. Dep't of Energy*,
   260 F. Supp. 2d 997 (S.D. Cal. 2003) ..............................................50

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ..........................................................................18

*City of Davis v. Coleman*,
   521 F.2d 661 (9th Cir. 1975) ............................................................22

*Columbia Riverkeeper v. U.S. Army Corps of Eng'rs*,
   No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020) ...............52

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   508 F.3d 508 (9th Cir. 2007) ............................................................50

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008) .........................................6, 50, 51, 52

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
   941 F.3d 1288 (11th Cir. 2019) ........................................................35

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
   72 F.4th 1166 (10th Cir. 2023) ........................................................23

*Del. Riverkeeper Network v. FERC*,
   753 F.3d 1304 (D.C. Cir. 2014) ........................................................41

*Dish Network Corp. v. NLRB*,
   953 F.3d 370 (5th Cir. 2020) ............................................................36

*Fox Bay Partners v. U.S. Corps of Eng'rs*,
   831 F. Supp. 605 (N.D. Ill. 1993) ..................................................33

*Friends of the Boundary Waters Wilderness v. Dombeck*,
   164 F.3d 1115 (8th Cir. 1999) ........................................................4

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) .....................................................................21

*Fritiofson v. Alexander*,
   772 F.2d 1225 (5th Cir. 1985) ......................................................18

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) .................................................................19

*Grand Canyon Trust v. F.A.A.*,
   290 F.3d 339 (D.C. Cir. 2002) .......................................................41

*Greater Yellowstone Coal. v. Flowers*,
   359 F.3d 1257 (10th Cir. 2004) .......................................................8

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) .....................................................................19

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
   746 F.3d 698 (6th Cir. 2014) ...................................................35, 36

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) .................................................................6, 16

*Lowman v. Fed. Aviation Admin.*,
   83 F.4th 1345 (11th Cir. 2023) ......................................................24

*Massachusetts v. E.P.A.*,
   549 U.S. 497 (2007) .....................................................................50

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...........................................................18, 19, 36

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
   565 F.3d 683 (10th Cir. 2009) .......................................................19

*O'Reilly v. All State Fin. Co.*,
    No. 22-30608, 2023 WL 6635070 (5th Cir. Oct. 12, 2023)
    .......................................................7, 16, 24, 25, 39, 40, 44, 45, 48, 55

*O'Reilly v. U.S. Army Corps of Eng'rs*,
    477 F.3d 225 (5th Cir. 2007) ...................................................39, 44

*Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ...................................................35, 36

*Protect Our Parks, Inc. v. Buttigieg*,
    39 F.4th 389 (7th Cir. 2022) ........................................................24

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
    636 F. Supp. 3d 33 (D.D.C. 2022).................................................36

*Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*,
    31 F. Supp. 3d 571 (S.D.N.Y. 2014)..........................................35, 36

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .................................................................5, 25

*Sabine River Auth. v. U.S. Dep't of Interior*,
    951 F.2d 669 (5th Cir. 1992) ......................................................7, 22

*Save Our Cmty. v. U.S. E.P.A.*,
    971 F.2d 1155 (5th Cir. 1992) ......................................................22

*Sierra Club v. FERC*,
    827 F.3d 59 (D.C. Cir. 2016).........................................................22

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017)..........................................51, 53, 54

*Sierra Club v. Sigler*,
    695 F.2d 957 (5th Cir. 1983) ..............................24, 25, 33, 37, 38, 47

*Spiller v. White*,
    352 F.3d 235 (5th Cir. 2003) .........................................................55

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021)......................................................56

*Stewart v. Potts,*
  966 F. Supp. 668 (S.D. Tex. 1998) ...................................................34

*Tex. Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n,*
  989 F.3d 368 (5th Cir. 2021) ............................................................23

*Tex. Democratic Party v. Benkiser,*
  459 F.3d 582 (5th Cir. 2006) ............................................................19

*Utah Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.,*
  528 F. Supp. 3d 1222 (D. Utah 2021) ...............................................51

*Wetlands Action Network v. U.S. Army Corps of Eng'rs,*
  222 F.3d 1105 (9th Cir. 2000) ..........................................................34

*WildEarth Guardians v. Jewell,*
  738 F.3d 298 (D.C. Cir. 2013) .....................................................22, 23

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.,*
  870 F.3d 1222 (10th Cir. 2017) ........................................................22

*WildEarth Guardians v. Zinke,*
  368 F. Supp. 3d 41 (D.D.C. 2019) ....................................................51

**Statutes**

28 U.S.C. § 1291 ...................................................................................1

33 U.S.C. § 1251 ...................................................................................7

33 U.S.C. § 1344 ...............................................................................7, 10

33 U.S.C. § 2317 ...................................................................................7

42 U.S.C. § 4331 ...................................................................................4

42 U.S.C. § 4332 ...................................................................................4

42 U.S.C. §§ 4321–4370m .....................................................................4

5 U.S.C. § 706 ........................................................................18, 47, 55

**Regulations**

33 C.F.R. § 320.4 ................................................................9, 47, 49

33 C.F.R. § 322.3 ...........................................................................8

33 C.F.R. Pt. 323 ...........................................................................8

33 C.F.R. Pt. 325 ...........................................................................8

33 C.F.R. Pt. 325, App. B ...............................8, 9, 26, 27, 28, 29, 37, 53

40 C.F.R. § 1500.1 ................................................................4, 5, 16

40 C.F.R. § 1500.2 .........................................................................4

40 C.F.R. § 1501.3 .........................................................................5

40 C.F.R. § 1501.4 .........................................................................6

40 C.F.R. § 1502.24 ........................................................................5

40 C.F.R. § 1506.13 (2020) ...........................................................23

40 C.F.R. § 1506.5 .........................................................................8

40 C.F.R. § 1508.13 ........................................................................6

40 C.F.R. § 1508.25 ........................................................................6

40 C.F.R. § 1508.27 ............................................................55, 56, 57

40 C.F.R. § 1508.7 ...................................................................6, 44

40 C.F.R. § 1508.8 ...................................................................6, 50

40 C.F.R. § 1508.9 .........................................................................5

40 C.F.R. § 230.1 .....................................................................8, 47

40 C.F.R. § 230.10 ...................................................................8, 49

40 C.F.R. § 230.11 ........................................................................48

40 C.F.R. § 230.91 .........................................................................7

40 C.F.R. Pt. 230 ....................................................................................8

**Rules**

Fed. R. App. P. 4 ...................................................................................1

**Other Authorities**

85 Fed. Reg. 43,304 (July 16, 2020) ................................................4, 23

# **GLOSSARY**

The following acronyms and abbreviations are used in this brief:

| | |
|---|---|
| APA | Administrative Procedure Act |
| CCSC | Corpus Christi Ship Channel |
| CEQ | Council on Environmental Quality |
| Corps | United States Army Corps of Engineers |
| CWA | Clean Water Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| IOBCWA | Ingleside on the Bay Coastal Watch Association |
| IPOCB | Indigenous Peoples of the Coastal Bend |
| Karankawa | Karankawa Kadla of the Texas Gulf Coast |
| Moda | Moda Ingleside Oil Terminal, LLC, or Enbridge Ingleside Oil Terminal, LLC |
| NEPA | National Environmental Policy Act |
| TCEQ | Texas Commission on Environmental Quality |
| TPWD | Texas Parks and Wildlife Department |
| USEPA | United States Environmental Protection Agency |
| USFWS | United States Fish and Wildlife Service |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 as an appeal from a final judgment in the United States District Court for the Southern District of Texas, Corpus Christi Division of July 27, 2023, which disposed of all parties' claims. ROA.1621. Plaintiffs timely filed the notice of appeal within 60 days of the district court's final judgment, in accordance with FED. R. APP. P. 4(a)(1)(B). ROA.1623.

## STATEMENT OF THE ISSUES

Issue One: Whether the Corps acted arbitrarily and capriciously by failing to take a hard look at the cumulative impacts to seagrass beds and to the neighboring community due to increased vessel traffic and expanded operations at the Moda Terminal, as required by NEPA and the CWA.

Issue Two: Whether the Corps acted arbitrarily and capriciously by failing to take a hard look at the cumulative impacts to the climate of the Moda Terminal expansion, as required by NEPA.

Issue Three: Whether the Corps acted arbitrarily and capriciously by failing to prepare an Environmental Impact Statement, as required by NEPA.

## <u>STATEMENT OF THE CASE</u>

### I.    INTRODUCTION

Plaintiffs Indigenous Peoples of the Coastal Bend, Karankawa Kadla Tribe of the Texas Gulf Coast, and Ingleside on the Bay Coastal Watch Association ("Plaintiffs") are non-profit organizations whose members live, recreate, and worship in the area near the Enbridge Ingleside Oil Terminal ("the Moda Terminal").[1] The Moda Terminal is located in San Patricio County, Texas on the Corpus Christi Bay, specifically where the Corpus Christi Ship Channel ("CCSC") meets the La Quinta Ship Channel ("LQSC") and immediately to the east of the City of Ingleside on the Bay. ROA.323. The property was previously the site of Naval Station Ingleside. *Id*. After Moda acquired an interest in 2018, the rapid expansion westward began. ROA.326.

The Moda Terminal is now the largest crude oil export terminal in the United States by a considerable margin. ROA.263. The proposed westward expansion of

---

[1] The permit was originally issued to Moda Ingleside Oil Terminal, LLC. On October 12, 2021—while this litigation was pending—the entity changed its name to Enbridge Ingleside Oil Terminal, LLC. All of the documentation in the "Administrative Record" ("AR") references "Moda" or the "Moda Terminal"; for consistency we do the same. As accuracy requires, we refer to Intervenor-Defendant directly as "Enbridge."

The AR was lodged by the Corps with the filing of Federal Defendants' Notice of Lodging the Corrected Certified Index to the Administrative Record. ROA.766-778. The AR is consecutively "bates stamped" and consists of pages AR000001 to AR001627. This brief cites to the index in the ROA and the AR using the bates number, though the leading "0"s are omitted.

the Moda Terminal would add five berths for oil tankers and barges, effectively doubling the existing vessel capacity. ROA.323.

Following an April 28, 2021 Environmental Assessment, the U.S. Army Corps of Engineers issued a dredge and fill permit under Section 404 of the CWA ("404 Permit") authorizing this substantial expansion of the Moda Terminal. ROA.150. The expansion would involve the dredging of approximately 3.9 million cubic-yards of material from the Corpus Christi Bay in order to increase the width of the West Ship Basin from 390 feet to 475 feet. ROA.323-24.

The expanded dredge footprint is necessary to extend the existing bulkhead along the shoreline, construct a new deep-water dock, and create a new 1,700-foot-diameter turning basin for deep-water tankers entering the West Basin from the CCSC. ROA.323.

The construction and operation of the expanded Moda Terminal will have significant impacts on the environment, the surrounding community, and the public interest. According to the seagrass survey conducted in support of the application, the expansion would have a direct impact on aquatic resources by destroying approximately 9.81 acres of diverse seagrasses and estuarine wetlands. ROA.296. However, the Corps limited the scope of its impacts assessment and failed to consider the impacts from the increased vessel traffic, including the risk of oil spills. ROA.365. Similarly, the Corps failed to consider the impacts of air, noise, and light

pollution from the Moda Terminal expansion. ROA.361. The Corps also avoided assessing impacts from the Moda Terminal expansion on the climate. *Id*. By avoiding the requisite hard look, the Corps understated the impacts of the Moda Terminal expansion.

## II.    STATUTORY BACKGROUND

### A. National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321–4370m, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[2] It makes environmental protection part of the mandate of every federal agency, 42 U.S.C. § 4331, and requires federal agencies to take environmental considerations and "any irreversible and irretrievable commitments of resources" into account in their decisionmaking "to the fullest extent possible," *id*. § 4332; 40 C.F.R. § 1500.2.

NEPA seeks to ensure that federal agencies take a "hard look" at environmental consequences before taking a major action. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999). One of NEPA's primary purposes is to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant

---

[2] As explained in detail below, after Moda submitted its application, the CEQ revised its NEPA regulations, effective September 13, 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). In its EA, the Corps applied the pre-2020 regulations, and so we do the same. *See Bair v. Cal. Dep't of Transp.*, 982 F.3d 569, 577 n.20 (9th Cir. 2020).

environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the general public, "that may also play a role in both the decisionmaking process and the implementation of that decision." *Id*.

NEPA requires federal agencies to fully disclose in "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement" referred to as an Environmental Impact Statement. The EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," and (4) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." *Id*. NEPA also requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b), 1502.24.

If it is unclear whether impacts are significant enough to warrant an EIS, a federal agency may prepare an "environmental assessment" to assist in making that determination. *Id*. §§ 1501.3, 1508.9. If the agency determines that no EIS is required, it must document that finding in a "finding of no significant impact"

("FONSI"). *Id*. § 1508.13. If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared. *Id*. § 1501.4.

An EIS must include a "range of actions, alternatives, and impacts." 40 C.F.R. § 1508.25. An agency must consider direct and indirect impacts of an action when determining the scope of an EIS. *Id*. § 1508.25(c)(1)–(2). The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id*. § 1508.8(a). The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

An agency also must analyze and address the cumulative impacts of a proposed project. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); 40 C.F.R. §§ 1508.7, 1508.25(c)(3). Cumulative impacts are the result of any past, present, or reasonably foreseeable future actions, regardless of who takes them. Such effects "can result from individually minor but collectively significant actions taking place over a period of time." *Id*. § 1508.7.

Where an agency's failure to consider relevant information renders it impossible for a reviewing court to determine the accuracy of the FONSI, the EA and FONSI are inadequate. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1179 (9th Cir. 2008).

Therefore, while an EA may be a "rough-cut, low-budget environmental impact statement," it nevertheless must provide sufficient evidence and analysis for determining whether to prepare an EIS. *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1992). To this end, an EA must be reasonably supported, such that a reviewing court can ensure that the agency has "reasonably considered the relevant issues and *reasonably explained the decision*." *O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 WL 6635070, at *5 (5th Cir. Oct. 12, 2023)

## B. The Clean Water Act

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). The CWA also established, as part of the Corps' water resources development program, the long-term goal "to increase the quality and quantity of the Nation's wetlands." 33 U.S.C. § 2317(a)(1).

To accomplish these goals, the CWA prohibits the discharge of dredged and fill materials into "waters of the United States" ("WOTUS") absent a permit issued by the Corps under CWA § 404. The Corps issues individual permits under CWA § 404(a) on a case-by-case basis after taking "all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States." 40 C.F.R. § 230.91(c)(2); *see* 33 U.S.C. § 1344(a). Such permits are issued after a review involving, among other things, site-specific documentation and analysis of waters

and wetlands and potential effects to them, public interest analysis, and a formal determination pursuant to the statutory and regulatory criteria. *See* 33 C.F.R. § 322.3 and Parts 323, 325.

Under the CWA, there are strict substantive limits on approving projects that degrade water quality or harm aquatic uses. First, the Corps may not issue a Section 404 permit if there is a "practicable alternative" to the project with less impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a). In undertaking this alternatives analysis, the Corps must define the project's "overall project purposes." *Id*.

Second, the Corps cannot issue the permit unless there is a demonstration that any discharge from the project "will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern," 40 C.F.R. § 230.1(c). Moreover, the Corps must independently verify all of the information in the permit application. *See, e.g., Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004); *see also* 40 C.F.R. § 1506.5(a).

### C. The Corps' Permitting Regulations

The Corps issues Section 404 permits pursuant to its regulations, 33 C.F.R. Parts 320 through 330, which incorporate NEPA requirements by reference. 33 C.F.R. Pt. 325, App. B § 2. The Corps also must follow the Section 404(b)(1) Guidelines, developed by the USEPA, found in 40 C.F.R. Part 230.

Before issuing any CWA permit, the Corps must determine that the project is in the "public interest" by weighing all "relevant" considerations and balancing all probable impacts of the proposed action against its alleged benefits. 33 C.F.R. § 320.4(a). The Corps must balance "the benefits which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments." *Id.* § 320.4(a)(1). The Corps must base its decision to issue a permit on "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.*

Similarly, the Corps' NEPA analysis should include direct, indirect, and cumulative impacts. 33 C.F.R. Pt. 325, App. B § 7(b)(3). In NEPA reviews, "the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." *Id.*

## III.    RELEVANT FACTS

The Moda Terminal is the single largest oil storage and export terminal by volume on the Gulf Coast. ROA.260. In the three years preceding 2021, storage capacity at the Moda Terminal increased from 2.1 million barrels of oil to 11.6 million barrels. ROA.259. An additional 3.5 million barrels of storage is under construction, and Moda has permits for another 5.5 million barrels. *Id.* An industry publication indicates that from January 2020 to February 2021 the Moda Terminal exported about 24% of total U.S. crude oil exports. ROA.263.

On January 10, 2020, Moda submitted to the Corps an application for a CWA 404 Permit, 33 U.S.C. § 1344, to conduct activities as part of its planned expansion of its West Basin and other improvements at the existing East Basin site. ROA.265. The proposed project would include the following development:

(a) Construct a new 10,000 square-foot deep-water ship dock supporting two berths (Berths 8 and 9) to accommodate up to two Suezmax tankers.[3]

(b) Construct a sheetpile causeway, pile supported approach, pile supported loading platform, and 21 dolphins to support Berths 8 and 9.[4]

(c) Construct a new Berth 7 dock barging area in the West Basin consisting of Berths 7A, B, and C, which would allow up to three double barges to dock side by side.

(d) Construct a barge loading facility in the uplands adjacent to the three new dock berths to support Berth 7A.

(e) Construct additional 491 feet of bulkhead along the shoreline, which involves installing a pile-supported barge dock for Berths 7A and B.

(f) Construct 38 barge dolphins for Berths 7A, B, and C.

(g) Construct a pile-supported barge platform, move fenderline 38 feet waterward, and construct 8 dolphins for Berth 2A.

ROA.270-71.

The expansion of the West Basin would require dredging approximately 3.9 million cubic yards of material. ROA.271. Near proposed Berth 7A, Moda would

---

[3] "Suezmax" is a term for the largest ship measurements capable of transiting the Suez Canal in a laden condition.

[4] "Dolphins" are piles driven into the ground in waterways for berthing (docking) and mooring (securing) of vessels.

dredge the existing bay bottom to a depth of -15 feet mean lower low water (MLLW) with a 2-foot over dredge. *Id*. In the remainder of the West Basin, near proposed Berths 7B, 7C, 8, and 9, Moda would dredge the existing bay bottom to a depth of -54 feet MLLW with a 2-foot over dredge. *Id*. The dredge footprint would be approximately 43 acres. *Id*.

Moda's application states that the "dredging would allow additional Suezmax vessels and additional barges at the facility." *Id*. In order to accommodate the construction projects and the increased vessel traffic, the project proposes to increase the width of the West Basin from 390 feet wide to 475 feet and add a 1,700-foot-diameter turning basin at the West Basin entrance to the CCSC. ROA.323.

A schematic of the existing and proposed berth configuration is shown below (ROA.179-80):



**Existing Berth Layout**            **Proposed Berth Layout**

The project proposes to directly destroy approximately 9 acres of seagrass beds. ROA.296. The permit application contains no information about the

throughput of crude oil or how many additional tankers and barges are anticipated on a daily or other basis.

On February 6, 2020, the Corps issued a public notice and opportunity for comments on Moda's proposed permit. ROA.378. On March 26, 2020, the Corps referred all comments to Moda for a response. ROA.775 (AR.595-601). Moda requested additional time to respond to comments, and the Corps determined that it was "most prudent to withdraw" Moda's application. ROA.775 (AR.593). Moda subsequently withdrew its application to allow for additional data collection and resubmittal.

On September 11, 2020, Moda filed a "Response to Comments," reinstating the permit application. ROA.774(AR.386). Moda revised its alternatives analysis and mitigation plan. ROA.774(AR.438, AR.443). The revisions were, in part, in response to comments by USFWS, USEPA, TCEQ, and TPWD. *See* ROA.329-33, 384, 388, 775(AR.632, AR.639).

The Corps prepared and issued an Environmental Assessment and Statement of Findings on April 2, 2021. ROA.323. In the Moda EA, the Corps defined the basic and overall project purpose as "[t]o dredge additional bay area and construct mooring structures to provide adequate depth and area for the berthing of *deeper-draft ships that will be used to transport liquefied natural gas*" and "to provide

adequate water depth and area for the *deeper-draft vessels that will be used to transport liquefied natural gas*." ROA.328 (emphasis added).

The Moda Terminal does not currently export liquefied natural gas, and the EA contains no discussion of liquefied natural gas. The EA contains no information about the volume of oil expected to be loaded and transported, the loading facilities for the tankers, or even the number and types of barges, tankers, or other craft that are expected to use the expanded terminal facilities on a daily, annual, or other basis.

According to the EA, the final public comment period closed on March 23, 2021 (ROA.348), however, the record does not establish that the public had notice of this. In fact, in a February 9, 2021 email, the Corps informed Sierra Club that the comment period was only open from February 6 to March 24, 2020. ROA.777(AR.1432). And when Plaintiffs asked the district court to admit as extra-record evidence a February 3, 2021 comment letter from IOBCWA that was not included in the AR, counsel for the Corps and Enbridge argued it post-dated the comment period. ROA.984, 1335. Regardless, extensive comments were filed by members of Plaintiff organizations. For example, IOBCWA expressed concerns about the expansion's potential impacts on the community, specifically, increased air, water, noise, and light pollution. ROA.403. IOBCWA posited that, as the number of vessels increases, so too will a number of other pollutants that result from cargo tankers: nitrous oxides, VOC discharges, sulfur oxide, and particulate matter.

ROA.405. IOBCWA raised the question of how water quality and water opacity will be affected by the cumulative effect of increasing numbers of large passing vessels. ROA.404.

## IV.    RELEVANT PROCEDURAL HISTORY

On August 3, 2021, Plaintiffs filed their Original Complaint in the U.S. District Court for the Southern District of Texas alleging that the public was deprived of environmental protections under NEPA, because the Corps issued the 404 Permit without considering the full direct, indirect, and cumulative impacts of the expansion. ROA.11. On October 7, 2021, the District Court granted Moda's motion to intervene. ROA.687.

On February 15, 2022, Plaintiffs filed their Motion to Permit Extra-Record Evidence and Take Judicial Notice of Relevant Facts. ROA.798. Specifically, Plaintiffs sought to introduce nine documents for the District Court's consideration, including four declarations—three of which were "standing" declarations for each of the plaintiff organizations, and the fourth being the declaration of Dr. Kirk Cammarata, Associate Professor at Texas A&M University-Corpus Christi and member of the Texas Seagrass Monitoring Workgroup, who has documented that seagrasses adjacent to the Moda Terminal are currently being affected by turbidity from operations. Plaintiffs further requested that the District Court take judicial notice of certain information, such as online news articles and documents obtained

from governmental sources. ROA.800. The Corps and Enbridge filed responses in opposition on March 15, 2022 (ROA.969, 1023), and Plaintiffs filed a reply in support of their motion on March 25, 2022. ROA.1048.

Pursuant to an agreed briefing schedule, adopted by order of the district court, Plaintiffs filed a motion for summary judgment on June 9, 2022. ROA.1070. On July 22, 2022, the Corps and Enbridge each filed combined cross-motions for summary judgement and opposition to Plaintiffs' motion. ROA.1259, 1308. On August 22, 2022, Plaintiffs filed replies in support of their motion for summary judgment and cross-opposition to the cross-motions filed by the Corps and Enbridge. ROA.1396, 1431. The Corps and Enbridge then separately filed replies in support of their cross-motions on September 9 and 12, 2022. ROA.1455, 1486.

On September 6, 2022, the district judge conditionally granted Plaintiffs' Motion to Permit Extra-Record Evidence and Take Judicial Notice, and indicated that he would "carry the request" and consider the propriety of the request when addressing the merits of the motions. ROA.1453.

On July 27, 2023, the district court entered an order granting the Corps' and Enbridge's motions for summary judgment and denying both Plaintiffs' Motion for Summary Judgment and Plaintiffs' Motion to Permit Extra-Record Evidence and

Take Judicial Notice of Relevant Facts.[5] ROA.1544. Plaintiffs filed their notice of appeal on September 22, 2023. ROA.1623.

## SUMMARY OF THE ARGUMENT

Plaintiffs contend the Corps violated NEPA and the CWA when issuing a permit to authorize the Moda Terminal expansion project, and that their final decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, per the APA, because the Corps failed to take a "hard look" at the indirect and cumulative impacts of the expansion on the environment.

For decades courts have made clear that the hard look must "concentrate on the issues that are truly significant to the action in question." *Kleppe v. Sierra Club*, 427 U.S. 390, 411 n.21 (1976); 40 C.F.R. § 1500.1(b). Therefore, while NEPA does not dictate a particular result, it does mandate that the Corps make its permitting decisions with its eyes wide open, and that it must inform the public what it learned when it took this hard look. To this end, the Corps must examine relevant data and articulate a satisfactory explanation for its action. *O'Reilly*, at *5. This information is not merely for the Corps' benefit; the public plays a major role.

---

[5] The district court did not specifically address each piece of extra-record evidence and information subject to judicial notice. However, we infer from the court's discussion that the three "standing" declarations were admitted for purposes of the standing inquiry. *See* ROA.1563-72. Plaintiffs do not raise the issues of extra-record evidence or judicial notice on appeal, based on the understanding that the "standing" declarations were admitted for purposes of the standing inquiry.

The stated purpose of the proposed Moda Terminal expansion project is to dredge the bay area and construct infrastructure necessary to provide the depth and area needed to accommodate increased use of a marine oil export terminal by deeper-draft vessels. ROA.328. Most notably, the EA did not assess, or even attempt to compile information about, the indirect and cumulative impacts from these deeper-draft vessels operating in the expansion area. Nor did the EA assess, or attempt to compile information about, the indirect climate impacts of authorizing the expansion.

The Corps' post-hoc rationalization is that it did not need to consider these indirect and cumulative impacts, because its regulations allow it to confine its assessment to those impacts within its "jurisdictional control." This reasoning is plainly erroneous, made clear by the fact that the EA weighed the "benefit" of increased oil production on the public interest in favor of the project, by finding it provided a benefit to "economics," "energy needs," and "needs and welfare of the people." ROA.359.

The EA is deficient under NEPA and the CWA. Without a meaningful assessment of the indirect and cumulative impacts associated with the increased vessel traffic, the Corps understated the impacts of the expansion project, which led to a failure to prepare an EIS, as required by NEPA.

# ARGUMENT

## I.    STANDARD OF REVIEW

Review of the district's court's summary judgment ruling presents a question of law that this Court reviews *de novo* with no deference to the district's court's legal conclusions. *Fritiofson v. Alexander*, 772 F.2d 1225, 1240 (5th Cir. 1985), *abrogated on other grounds by Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669 (5th Cir. 1992). The Corps' actions Plaintiffs challenged under NEPA and the APA are reviewed under the "arbitrary and capricious" standard. *See* 5 U.S.C. § 706(2)(A)). Agency action must be set aside where it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*.

The agency action must be set aside if:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Though this standard is a narrow one, the court's review must nevertheless be "searching and careful," "thorough, probing, and in-depth." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 416 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). An agency's decision under NEPA can be upheld, if at all, based on "only the agency's reasoning at the time of decisionmaking," not

"post-hoc rationalization concocted by counsel." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,* 565 F.3d 683, 704 (10th Cir. 2009); *see also Motor Vehicles*, 463 U.S. at 50.

## II.    PLAINTIFFS HAVE STANDING

Plaintiffs have associational standing because their members would independently have Article III standing, their claims are germane to the purpose of the organizations, and participation of individual members is not required to assert the claims or secure the relief sought. *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

With respect to the first part of the *Hunt* test, at least one member of one of the plaintiffs has demonstrated (1) an injury in fact, (2) that is fairly traceable to the challenged action, and (3) that is likely to be redressed by a favorable judicial decision. *See Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).

Sandra Love Sanchez, Absolem Yetzireh, and Patrick Nye are members of Indigenous Peoples of the Coastal Bend, Karankawa Kadla Tribe of the Texas Gulf Coast, and Ingleside on the Bay Coastal Watch Association, respectively. Each attests at length to a close personal, spiritual, and geographical connection to the area that will be affected by the Moda Terminal expansion; that their experience will be damaged by the increased industrialization and damage to adjacent resources; and

that the organization to which each belongs has a purpose in keeping with the requests in this suit.

For example, Ms. Sanchez is a founding member of IPOCB and a descendant of the Karankawa people. ROA.1124. As part of its mission, IPOCB is dedicated to educating and advocating on behalf of its members and local indigenous people on issues related to protection of the natural environment and places of cultural significance. ROA.1124-25. Ms. Sanchez testified that the area near the Moda Terminal is an area of cultural significance, and she regularly travels to Ingleside on the Bay with other members of IPOCB to enjoy the natural beauty of the land and the ocean, and to take part in educational events and other recreational and spiritual activities. ROA.1125-26. Ms. Sanchez testified to visiting the beach to the west of the existing Moda Terminal, observing wildlife and the natural setting, and participating in spiritual ceremonies involving singing and drumming. ROA.1127. The ceremonies are already impacted by the noise, constant ship traffic, and other industrial activity at the Moda Terminal, which will be exacerbated as the expansion moves westward. ROA.1127-28. Though Ms. Sanchez desires to return to the area as often as monthly, she fears the activities she has planned will be impaired by the Moda Terminal expansion. *Id.*

Mr. Nye is the president of the Board and a member of IOBCWA. ROA.1142. Mr. Nye lives in close proximity to the site of the Moda expansion, and regularly

engages in activities in the area, such as fishing, boating, wildlife viewing—particularly bird watching—and entertaining friends and family members, including young grandchildren, outside and on the edge of the water. ROA.1145. He and his family and guests experience unpleasant sights, sounds, and smells from the Moda Terminal and its ship traffic while at his home. ROA.1145-46. He has also observed plumes of silt in the Bay coming from ships docking at the Moda Terminal, which impairs the quality and clarity of the water in front of his house, specifically obscuring his ability to see the seagrasses. ROA.1146. The expansion would exacerbate these harms by bringing the activity closer to his home and impacting his enjoyment of boating and fishing activities. ROA.1146-47.

As the Supreme Court has stated, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (internal quotation marks omitted). "The procedural injury implicit in agency failure to prepare an EIS—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project [such that they can] expect [ ] to suffer whatever environmental consequences the project may have." *Sabine River Auth.*, 951 F.2d at

674 (quoting *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975)). The injury

stated by these declarants is far more than the required "identifiable trifle." *Save Our*

*Cmty. v. U.S. E.P.A.*, 971 F.2d 1155, 1161 (5th Cir. 1992).

Here, the declarants' asserted injury is imminent and directly caused by the

Moda Terminal expansion, since the 404 Permit will lead directly to destruction of

seagrass beds, disruption of wildlife habitat, and further industrialization at the Moda

Terminal and in the general area.

The injury is redressable by the relief sought since complying with NEPA and

the CWA and taking the requisite "hard look" could cause the agency to change its

position on approving the expansion as proposed. *Sierra Club v. FERC*, 827 F.3d 59,

67 (D.C. Cir. 2016) (remedying procedural violation could cause the agency to

change its position). A favorable decision here will set aside the Corps' decision

authorizing the Moda Terminal expansion until the Corps can adequately analyze

and disclose the environmental consequences of the proposed expansion.

Additionally, federal courts have specifically affirmed that environmental

groups can establish standing to challenge the adequacy of an agency's climate

analysis under NEPA on the basis of non-climate aesthetic and recreational injuries.

*See WildEarth Guardians v. Jewell*, 738 F.3d 298, 306-07 (D.C. Cir. 2013);

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1221-32 (10th

Cir. 2017); *see also Tex. Ass'n of Manufacturers v. U.S. Consumer Prod. Safety*

*Comm'n*, 989 F.3d 368, 380 (5th Cir. 2021) (applying *WildEarth v. Jewell* principles to allow challenge to final agency rule).

## III.   PRE-2020 CEQ REGULATIONS CONTROL

Though it was not in dispute among the parties, the district court erroneously determined the 2020 comprehensive revisions of the CEQ's NEPA regulations applied. This Court should apply the pre-2020 regulations.

The CEQ's comprehensive revisions to its NEPA regulations went into effect on September 14, 2020, after Moda submitted its application but before the EA and FONSI were issued. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). The 2020 revisions expressly applied "to any NEPA process begun after September 14, 2020," though an agency had discretion to apply the 2020 revisions to ongoing activities and environmental documents commenced before September 14, 2020. 40 C.F.R. § 1506.13 (2020); 85 Fed. Reg. at 43,372-73.

Federal courts have routinely, and without much debate, applied the NEPA regulations relied upon by the agency that conducted the NEPA review: "Because [the agency at issue] applied the previous [NEPA] regulations to the Project, so do we." *Bair v. Cal. Dep't of Transp.*, 982 F.3d 569, 577 n.20 (9th Cir. 2020); *see also Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 n.6 (10th Cir. 2023) ("[The agency's] actions are subject to the previous regulations

because the actions were all completed prior to the effective date of the new regulations and because [the agency] applied the prior regulations."); *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1349 n.1 (11th Cir. 2023) (applying same regulations as agency, where "the FAA 'decided to apply the regulations in effect' in February 2020 when it initiated the NEPA process"); *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 n.3 (7th Cir. 2022) (relevant to the court applying pre-2020 regulations was that all parties had agreed the 2020 revisions did not apply).

Very recently, this Court determined that where the Corps' final decisional document was issued after the September 14, 2020 effective date of the 2020 revisions, the decisions challenged "were subject to the earlier version of the regulations." *O'Reilly*, 2023 WL 6635070, at *1 n.1.

Another analogous case is *Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983). Where a new set of mandatory CEQ regulations were promulgated several months before the filing of the Draft EIS, but with an effective date after, the Corps had the choice of proceeding under the old guidelines or the new regulations. *Id*. at 965. The Corps expressly chose the new regulations, but after the Final EIS was challenged, argued judicial review should proceed under the old guidelines. *Id*. This Court disagreed, reasoning:

> The purpose of judicial review under NEPA is to ensure the procedural integrity of the agency's consideration of environmental factors in the EIS and in its decision to issue permits. If the agency follows a

particular procedure, it is only logical to review the agency's adherence to that procedure, not to some altogether different one that was not used.

*Id.* at 966.

In this case, the Corps indicated that the Moda EA was subject to the CEQ regulations that preceded the comprehensive changes in 2020. ROA.1270. Additionally, no party disputes that the pre-2020 CEQ regulations control. Therefore, the Court should apply the pre-2020 CEQ regulations here.

## IV.    THE CORPS ACTED ARBITRARILY AND CAPRICIOUSLY

The Corps failed to meaningfully consider the potential indirect and cumulative impacts of the Moda Terminal expansion. Without a meaningful assessment of the past, present, and reasonably foreseeable future impacts—including those direct and indirect impacts that occur later in time or farther removed—the Corps understated the impacts of the Moda Terminal expansion, and has acted arbitrarily in relying on this EA to issue a FONSI rather than prepare an EIS.[6]

---

[6] As mentioned, the EA indicates the final public comment period closed on March 23, 2021 (ROA.348). The Corps informed the public that it closed on March 24, 2020. ROA.777(AR.1432). IOBCWA's February 3, 2021 comment letter was not considered; the Corps' counsel argued it was untimely. ROA.984. This threshold issue is relevant to whether the Corps has acted within the zone of reasonableness and, in particular, has reasonably explained its decision (*O'Reilly*, 2023 WL 6635070 at *4) and whether information was made available to the public so that they could play a role in the decisionmaking process, as required by NEPA. *See Robertson*, 490 U.S. at 349.

## A. The Corps' impacts assessment is deficient.

The direct, indirect, and cumulative impacts assessment in the EA improperly narrows the scope to exclude the impacts from the planned uses of the West Basin expansion areas; it fails to assess damage already wrought in the area from prior projects or offer any analysis of how present impacts from past actions would combine and interact with impacts of this action and foreseeable future actions; and the Corps improperly analyzed the benefits from the Moda Terminal expansion without analyzing the costs. The Corps' cumulative impact assessment also fails to comply with the requirements of the CWA.

### i. *The EA fails to assess impacts from increased vessel traffic on seagrasses and on the neighboring community, as required by NEPA.*

The EA is fundamentally flawed because it arbitrarily limits the consideration of direct, indirect, and cumulative impacts of the Moda Terminal expansion to the "temporary" impacts from dredging and construction and the wetland and seagrass habitat that will be directly lost to the dredge footprint. ROA.355, 365-66. Nowhere in the EA or its "scope of analysis" under NEPA does the Corps claim that it may limit its "hard look" to only construction-related impacts and not operational impacts—nor is this distinction found in the Corps' NEPA implementing regulations. *See* 33 C.F.R. Part 325, App. B. Yet, this was the basis of the district court's reasoning, affirming the Corps' actions by way of affirming a narrow "scoping

decision." ROA.1597-1602.  But it's not in its "scope of analysis" that the EA limited the Corps' assessment of the impacts, it was in its arbitrary and unreasonably myopic identification of the direct, indirect, and cumulative impacts. Both the district court's and the Corps' reasoning are erroneous, but for different reasons.

The district court's decision hinged on the arbitrary distinction between construction and downstream operational effects, based on its description of the Corps' "scoping decision" that is not supported by the EA. ROA.1597. The EA's scope of analysis was not defined based on construction or operational effects—it was based on the geographical areas where permitted activity will occur. ROA.327. Following a description of how the Corps' NEPA implementing regulations inform the agency's "scope of analysis," the EA defines the scope as follows:

> In this instance the Corps' scope of analysis includes: structural improvements to the East Basin; the 491-foot bulkhead extension area along the shoreline; the structural improvements and 43-acre dredging footprint (including side slopes) in the West Basin; the Sunset Lake seagrass mitigation area, and 50-acre wooded habitat mitigation area along the eastern side of the facility to be preserved. The shoreward portion of the project is already fully developed so there is no need to expand the scope of analysis into that area.

ROA.327.

The district court did not rely on this geographic scope of analysis in the EA, which the Corps had defined based on its NEPA implementing regulations, 33 C.F.R. Pt. 325, App. B. The district court instead performed its own scoping analysis under the Corps' NEPA regulations, but in doing so, misapplied the factors from Appendix

B. That is because the regulations speak of situations that justify *expanding* the agency's review beyond the limits of its jurisdiction, *i.e.*, expanding its review from WOTUS to upland portions of the project, not limiting the types of direct, indirect, or cumulative impacts that must be considered.

In fact, to illustrate this distinction, the regulations specifically describe a scenario in which the Corps' permit is one component of a larger project. *Id.* § 7(b)(1). In such a case, the regulations state that the district engineer should establish the "scope" of the NEPA document beyond the geographical area of Corps jurisdiction to address the impacts of the specific activity requiring the Corps permit "and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." *Id*. The regulations provide four factors that are meant to help determine whether to *expand* the scope where "sufficient control and responsibility" exists. *See id*. § 7(b)(2)(i)-(iv).

And the regulations provide an example to illustrate the intent. They explain that if a non-Federal oil refinery or industrial facility is proposed to be built on an upland site and the only Corps permit requirement relates to "a supply loading terminal . . . , that terminal . . . , in and of itself, normally would not constitute sufficient overall Federal involvement with the project to justify *expanding* the scope of a Corps NEPA document to cover *upland portions of the facility* beyond the

structures in the immediate vicinity of the regulated activity." *Id.* § 7(b)(3) (emphasis added).

In this case, however, the Court need not refer to the four factors, because there is no question that the Corps has jurisdiction over the area of the Corpus Christi Bay that will be dredged; the listed factors are, therefore, irrelevant here. Yet, the District Court referred to these factors in its analysis and incorrectly determined that they justified the Corps *limiting* the scope of its impacts assessment.

Here, the issue is not whether the Corps' *scope* should be *expanded* to Moda's upland industrial facility, where Moda stores the crude oil in its tank farm and where it may be planning additional industrial projects. The issue is that the Corps has *limited* its *impacts assessment* to exclude activities that will occur in the geographic area within which the Corps undeniably has jurisdiction, i.e., impacts that are within the Corps' defined scope. The EA plainly acknowledges this scoping process under NEPA:

> Once the scope of analysis is defined under NEPA, this is the *geographic* area within which the Corps is responsible for evaluating effects of activities. Direct, indirect, and cumulative effects of the activities within this scope will be evaluated.

ROA.326 (emphasis added).

The Corps' scope includes the 43-acre dredging footprint in the West Basin, and explains that the "shoreward portion" is excluded from the analysis. ROA.327. The dredging of the 43-acre area is, according to the Corps' project purpose, "to

provide adequate water depth and area for the deeper-draft vessels." ROA.328. These deeper-draft vessels will use the Moda Terminal by way of the new deep-water dock and turning basin, which are located in the 43-acre dredge footprint, as depicted in Moda's application. ROA.276, 278.



ROA.278. The shaded area shows the proposed dredging area, which is necessary

for the construction *and* access to the deep-water dock by deep-draft Suezmax ships.

Furthermore, the Corps does not lack ongoing regulatory control over the operation of the Moda Terminal. The EA describes the activity requiring a permit: "The condition of the dredge slope and block mattresses will be monitored for a period of five years by conducting annual hydrographic surveys of the basin. . . . Navigational aids will be installed to . . . prevent vessels from disturbing nearby seagrass area *during operational movements*." ROA.324 (emphasis added). In effect, the EA acknowledges the potential for the dredge slope to become compromised and the need for the Corps to maintain regulatory control to prevent some unwanted impact. This description also acknowledges the potential for moving vessels to harm nearby seagrasses *during operations*. However, the impacts caused by moving vessels are not assessed anywhere in the EA impacts assessment. *See* ROA.365, 367.

The same logic that applies to assessing impacts of moving vessels to nearby seagrasses also applies to assessing risks of oil spills from those vessels and those operational (potentially accidental) impacts on the neighboring community. In other words, the very proximity, depth, and nature of the dredge footprint authorized by the Corps means the moving vessels will impact the seagrass beds and the neighboring community. In fact, the location, depth, and nature of the dredge footprint is precisely to allow vessels to move in and out of the location near the seagrass beds and neighboring community.

*Sierra Club v. Sigler* offers guidance directly on point. In *Sigler,* the applicant sought to extend and deepen the channel into Galveston Bay to facilitate the traffic in large ships. 695 F.2d at 961. Based on an EIS, the Corps issued permits authorizing the deepening of the channel and construction of an oil terminal, tank farm, and pipeline system. *Id*. at 963. However, the EIS did not consider impacts of the "bulk cargo activities." Plaintiff argued that since the EIS relied on the "benefits" of these activities, it must also evaluate their adverse effects. Additionally, plaintiff argued the EIS should have assessed those adverse effects as cumulative effects or as secondary or indirect effects. *Id*. at 975. This Court agreed and found the EIS deficient, because it excluded environmental costs of the bulk cargo activities. "That exclusion strikes at the heart of NEPA." *Id*. at 980.

Another example is *Fox Bay Partners v. U.S. Corps of Eng'rs*, 831 F. Supp. 605, 608 (N.D. Ill. 1993). In affirming the Corps' denial of a 404 permit, the court explained that the principal basis for the Corps' decision was "the potential increase in the number of large power boats that the marina would introduce to, and the effects these boats would have on, the aquatic ecosystem of the Fox River and Chain–O–Lakes." *Id*. at 607.

Ultimately, the question is whether the impacts are reasonably foreseeable, in which case they must be placed before the public. As one court put it, "[i]n all of the cases in which Corps jurisdictional disclaimers have been upheld, the activities

33

involving waters of the United States, and therefore invoking Corps jurisdiction and NEPA, were physically, functionally, and logically separable from the activities held not subject to NEPA analysis." *Stewart v. Potts,* 966 F. Supp. 668, 682 (S.D. Tex. 1998). Here, the activities involving WOTUS are physically, functionally and logically *inseparable* from the increased vessel traffic and other activities that produce the impacts. The dredge and fill here has no independent utility apart from oil tanker traffic. *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1116 (9th Cir. 2000) ("We have upheld an agency's decision to limit the scope of its NEPA review to the activities specifically authorized by the federal action where the private and federal portions of the project could exist independently of each other.").

While the Corps' argued to the district court that increased vessel traffic falls outside the scope of the Corps' review, the EA fails to explain why—nor does the EA distinguish between construction-related impacts and operational impacts. This overly strict "construction versus post-construction" distinction was one advanced for the first time by the district court, but it is not supported by legal precedent. The cases on which the district court relies are distinct from the one at hand, and further exemplify the difference in impacts from the Moda Terminal expansion (within Corps' control and responsibility) versus impacts from the operation of the upland storage facility (not necessarily within Corps' control and responsibility here).

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288 (11th Cir. 2019), involved a scenario in which the Corps issued a permit for a phosphate ore mine but did not assess the effects of the storage of byproducts resulting from remote and future processing of the phosphate ore. The processing and storage both took place outside WOTUS. In upholding the Corps' permit decision, the court explained: "Florida has authority over phosphate mining, and the Corps has authority only over U.S. waters." *Id.* at 1303. Similarly, here, the storage of crude takes place at Moda's upland facility, outside WOTUS and outside the area where the Corps has jurisdiction, and Plaintiffs do not seek to expand the scope of the analysis to include storage.

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698 (6th Cir. 2014), and *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) involved Corps permitting related to coal mining, in which the Corps only "played a relatively minor role" and the mining was governed by a "centralized regulatory program" housed in another agency. Neither circumstance is present here, where the Corps is the deciding authority on whether the dredging and filling for the expanded tanker traffic occurs, and the expansion and its effects take place in WOTUS.

*Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*, 31 F. Supp. 3d 571 (S.D.N.Y. 2014), is a New York district court case that involved one of the

city's marine transfer stations. Like *Kentuckians* and *OVEC*, the Corps' role was relatively minor; the marine transfer station was a part of the City's comprehensive Solid Waste Management Plan, which had been subject to its own public EIS process. *Id.* at 578, 589. Here, there is no other agency with jurisdiction taking a hard look at the impacts of increased vessel traffic, specifically, increased vessel traffic pursuant to Corps authorization.

Finally, *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33 (D.D.C. 2022), involved Corps permitting needed for the replacement of existing sections of an oil pipeline. The question was whether the replacement of certain sections required consideration of the impacts from operation of the entire pipeline. *Id*. at 54. This is not the question presented here, which is whether the expansion of the dock and turning basin to accommodate vessel traffic requires consideration of the impacts from that vessel traffic in that very location.

The Corps argued that assessing increased vessel traffic is not required because the Corps has "limited statutory authority." ROA.1278-79. The Corps did not raise this defense in its EA or in response to comments about effects of terminal operations. This amounts to an impermissible post-hoc rationalization, not supported by the EA. *See Motor Vehicles*, 463 U.S. at 50; *Dish Network Corp. v. NLRB*, 953 F.3d 370, 380 (5th Cir. 2020).

> ### ii. The Corps' impact assessment arbitrarily gives weight to benefits without assessing related costs.

The Corps' assessment of "benefits" further illustrates that its failure to consider certain indirect and cumulative impacts of the project—namely those related to the increase in vessel traffic and expanded operations at the Moda Terminal—was arbitrary and capricious.

The EA defines the benefits of the proposed Moda Expansion project:

> The proposed work would have economic benefits for the applicant since the applicant would be able to accommodate Suezmax vessels for the export of petroleum products. The project would also benefit the needs and welfare of the general public by increasing the supply and availability of energy. The proposed work would improve navigation along La Quinta Channel as the proposed work will enhance navigational access to the site.

ROA.360. The EA continues: "The beneficial effects of adequately meeting the public's need for the transportation of petroleum *via marine shipping* will continue until the public's need is no longer present." ROA.362 (emphasis added). However, the Corps' regulation states that, "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." 33 C.F.R. Pt. 325, App. B § (7)(b)(3). Likewise, *Sigler* requires that the discussion of costs and impacts must be coextensive with the purpose and purported benefits of the project. 695 F.2d at 978-79.

In *Sigler*, the Corps included the benefits of a dredging and oil terminal project in its NEPA document, but left out increased risk of collision and oil spill, pollution from the additional industrial development, fire and explosion hazards and general socio-economic costs. *Id.* at 976. The court determined that "once the Corps *chose* to trumpet the benefits of bulk cargo activities in the EIS as a 'selling point' for the oil project, it rendered a decision that these activities were imminent" not speculative, which requires a NEPA analysis. *Id.* at 979. "There can be no 'hard look' at costs and benefits unless all costs are disclosed." *Id.*

The scenario presented here is the same as in *Sigler*. The Corps did not argue that it evaluated risks such as oil spills, impacts on adjacent property owners, and indirect impacts to seagrasses—the Corps only argued that it does not have to. ROA.1278-79. In addition, the Corps provided no data or analysis on the supposed benefits to the public, only conclusory statements in favor of these "benefits." ROA.360, 362. Because the EA excludes the environmental costs, while extolling the benefits of increased vessel traffic, it is deficient. *See* 695 F.2d at 980.

### iii. *The EA fails to assess incremental impacts of the project.*

#### 1. **Atchafalaya Basinkeeper** *does not exempt the Corps from a meaningful cumulative impacts assessment.*

The district court relied heavily on *Atchafalaya Basinkeeper*, 894 F.3d 692 (5th Cir. 2018) in reaching its decision. ROA.1607. The district court's interpretation is that *Atchafalaya Basinkeeper* effectively exempts the Corps from conducting a

meaningful cumulative impacts analysis because the Corps claimed mitigation would offset the impacts. ROA.1608. Setting aside that the district court's interpretation effectively shields the Corps from examining impacts from vessels using the 43-acre dredging footprint, this Court has recently rejected this reasoning in *O'Reilly*, 2023 WL 6635070.

In a prior case, the former property owner applied for a 404 permit for a project called Timber Branch II (TB-II). The Corps granted the 404 permit, authorizing the dredging and filling of 39.54 acres of wetlands. The district court enjoined the TB-II project, holding the Corps abused its discretion in issuing the permit without any "real analysis or data," which this Court affirmed in *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007). In November 2020, the Corps approved a new 404 permit for the reintroduced TB-II project. 2023 WL 6635070, at *3. It was again challenged. On appeal, this Court distinguished the matter from *Atchafalaya Basinkeeper*. *Id.*

In *Atchafalaya Basinkeeper*, the EA found no incremental impact at all. *Id.* at *7. The TB-II EA, on the other hand, conceded that the project would have some incremental impact on the environment. *Id.* This Court held, where the project will have some incremental impact on the environment, it is arbitrary and capricious for the Corps to limit its cumulative impacts analysis. *Id.*

Here, the district court based its deference to the Corps' limited cumulative impacts assessment on the fact that the Corps, considering Enbridge's "12-Step Mitigation Plan," concluded that overall cumulative impacts are not considered to be significant, because compensatory mitigation will "offset the impact to eliminate *or minimize* the . . . cumulative effects." ROA.1608. But this Court in *O'Reilly* flatly rejected this logic. 2023 WL 6635070, at *7 ("Appellees maintain that the Corps was relieved of its responsibility to conduct a cumulative impact analysis because the EA showed that TB-II would not have any significant effects on the environment. . . . Appellees confuse incremental impact and significant impact.").

As explained below, the EA in this case acknowledges, even within the narrow impacts analysis, that there will be *some* level of incremental impact on the environment. ROA.366-67. Because the EA determined the Moda Terminal expansion would have some incremental impact on the environment, it was arbitrary and capricious for the Corps to limit its cumulative impact analysis. *See O'Reilly*, at *7.

### 2. *The EA fails to document, explain, or analyze the overall impact of accumulated individual impacts.*

The Corps' EA is also inadequate because it fails to assess incremental impacts, as required by NEPA.

Under NEPA, "a meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are

expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

In performing this five-step assessment, the EA first identifies the geographic and temporal scope for impacts. ROA.365. Without explaining any basis for the decision, the Corps limited its cumulative impacts assessment to a period spanning five years in the past and five years in the future. ROA.365.

Second, and as discussed above, the EA (improperly) identifies the expected impacts from the Moda Terminal expansion as the "temporary" impacts primarily associated with short-term suspension of sediment during dredging. ROA.367. There is no mention of ongoing sedimentation from vessel traffic, risks of oil spills, or air, noise, and light pollution from activity at the Moda Terminal. *See id.*

Third, the EA identifies past and present actions outside and within the Corps jurisdiction. ROA.366. The Corps' description of the past and present actions outside its jurisdiction is general and vague, describing what has already been constructed as "infrastructure, commercial and residential developments, parks and recreational

areas, and industrial areas." *Id*. The description of action within its jurisdiction is not much more evocative.

The EA recites categories of activities in the review area requiring Corps permits, including "oil and gas development, private piers, erosion control, installation of utility lines, and dredging and filling permits associated with residential and commercial developments including marinas." ROA.366. The EA identifies "major" dredging projects that have occurred in the past 60 years: CCSC and LQSC, which receive regular maintenance dredging; at least five unnamed marine commercial facilities; and the former Naval Station Ingleside—all of which have "dredged large basins and access channels or enlarged existing ones in association with commercial ship traffic." *Id*. The EA also identifies future actions: continued residential development, construction of new or expansion of "several" existing LNG marine terminals, expansion of the Port of Corpus Christi facilities, the La Quinta Gateway Project, the CCSC Improvement Project, and "pending Corps permits for large dredge or fill activities." *Id*.

To satisfy the fourth step, the EA provides no individual assessment of these projects, only that there is "some indication of potential stressors, and potential impacts, on the environment," and the effect within the last five years resulted in "authorization to impact approximately 89 acres of [WOTUS]," with "required compensatory mitigation resulting in the creation of 44.6 acres of [WOTUS]." *Id*.

The expected impacts of these future actions are listed as "possible pollution associated with oil and gas exploration and transportation, upland habitat losses and disturbance; temporary impacts to water quality, development pressure on aquatic areas requiring Corps permits, and increases in human populations as the area becomes more developed." *Id*.

Regarding the fifth and final step, the EA fails to assess the overall impact that can be expected if the individual impacts—including those from the existing Moda Terminal and the proposed expansion—are allowed to accumulate.

Cumulative impacts analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects without a quantified assessment of their combined impacts. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020). Yet, the EA here provides no information about the location, area affected, amount of dredged material, changes that have occurred in seagrass beds or wetlands, occurrences of spills or accidents, or any other data about these admittedly major projects. Nor is there any specific information provided about the impacts of future actions—even though the "La Quinta Gateway Project" and "the CCSC Improvement Project," for example, are projects that will undeniably have a significant impact on the environment, in which planning is currently underway. The EA acknowledges that the key issues of concern in Corpus Christi Bay watershed are water quality and loss of special aquatic sites, which includes

seagrass beds affected by this project. ROA.366. Yet there is no actual discussion of the cumulative impacts on these resources.

Rather than quantifying combined impacts, the EA offers the conclusory, one-sentence statement that the incremental contribution of the proposed activity to cumulative impacts in the area are not considered to be significant. ROA.368. But this conclusory "discussion" does not satisfy NEPA. *O'Reilly*, 2023 WL 6635070 at *5 (citing *O'Reilly*, 477 F.3d at 231 ("This Court has repeatedly held that 'mere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's decision not to prepare an EIS.")).

Setting aside the Corps' deficient identification of impacts, the EA still acknowledges there will be impacts that will not be completely mitigated; so, the Corps is not relieved from meaningfully examining incremental impacts in its cumulative impacts assessment. *See id.* at *7. In effect, the Corps has confused incremental impacts with significant impacts. But NEPA requires consideration of cumulative impacts precisely so as not to discount the effect of incremental impacts when added to others. *See* 40 C.F.R. § 1508.7.

In a nearly identical case, this Court recently rejected the approach taken by the Corps here. In *O'Reilly*, the Court reasoned, without assessing incremental impacts, projects that result in a number of incremental impacts on the environment

"could pile up and lead to something significant, while escaping the eye of the Corps." *O'Reilly* at *7. The application of this NEPA requirement makes sense here.

Had the EA meaningfully considered the impact of incremental effects, it would have, for example, disclosed the nature of the dredging in the CCSC and the LQSC, and the proximity of the two to the Moda Terminal and the proposed new dredging footprint and turning basin (which the EA acknowledges, ships will use to access the Moda Terminal). ROA.323. And the EA also would have assessed any impacts on vessel numbers and impacts from vessel traffic, particularly whether an increase in vessel traffic posed incremental, but significant impacts to the environment from sediment, risk of oil spills, or air, noise, and light pollution. Afterall, in assessing the project's "benefits," the EA indicates the Moda Terminal expansion would "improve navigation along La Quinta Channel" since it will "enhance navigational access to the site." ROA.360.

The following "vicinity map" depicts the configuration of the CCSC, running northeast and southwest, and its junction with LQSC, running northwest to southeast, by the Moda Terminal and Ingleside on the Bay:



ROA.776(AR.905).

In sum, the Corps' failure to document, analyze and consider adequately the

incremental impacts from the Moda Terminal expansion in conjunction with past,

present, and reasonably foreseeable future actions is contrary to NEPA and the CWA,

and is arbitrary, capricious, and an abuse of discretion, in violation of the APA, 5 U.S.C. § 706(2).

### iv. *The Corps' failure to assess cumulative impacts is a violation of CWA requirements.*

The Corps' failure to meaningfully assess cumulative impacts also amounts to separate violations of CWA. The Corps' regulations require an assessment of direct and indirect impacts, just like NEPA. But the EA must also be reviewed for adherence to Corps regulations, for if a court were to review it only under NEPA, the numerous non-NEPA factors that the Corps must consider would be ignored. *Sigler*, 695 F.2d at 967.

Additionally, while there is overlap between the NEPA requirements and the Corps' Section 404 public interest analysis, the Corps' 404(b)(1) requirements are mandatory, and they mandate specific results. Under 404(b)(1), the Corps is prohibited from approving a project "unless it can be demonstrated that such a discharge [from the project] will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 230.1(c). 33 C.F.R. § 320.4(a) requires the Corps to consider the probable impacts of the proposed action, its putative benefits, and weigh all "relevant" considerations. The Corps must balance the benefits "which reasonably may be expected to accrue" from the action against the "reasonably foreseeable detriments." *Id*. Regulations explicitly require

close consideration of "secondary" effects, defined as "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." 40 C.F.R. § 230.11(h).

These are functionally similar to the NEPA requirement that the Corps evaluate direct, indirect, and cumulative impacts of its permitting decision. The Corps recognizes this by assessing the NEPA and CWA requirements in a single document. ROA.323.

Just as the Corps has attempted a post-hoc rationalization in defense of its NEPA violations, the Corps asserted, to the court, that it may limit its assessment to dredging in the project's footprint. ROA.1302.

The district court relied on this Court's decision in *Atchafalaya Basinkeeper* as providing the "most on-point case for discussing the CWA's cumulative-impacts requirements," although the court acknowledged that *Atchafalaya Basinkeeper*'s merits-based discussion of cumulative impacts is limited to NEPA and does not mention the CWA. ROA.1618. But this Court distinguished *Atchafalaya Basinkeeper* in *O'Reilly*, 2023 WL 6635070. Not only does the district court's interpretation of *Atchafalaya Basinkeeper* threaten to essentially eliminate the cumulative impacts requirements of NEPA altogether, but *Atchafalaya Basinkeeper*

plainly does not control the Court's review of the Corps obligations under the CWA, because that case involved a NEPA assessment, not a CWA assessment.

The Corps' EA considered all of the claimed benefits of the operation of the Moda Terminal expansion without any of its detriments, such as impacts on seagrasses. The EA states that effects from "construction activities" would be temporary and minimal, and then asserts that the benefits of the project to navigation, economic benefits to the applicant, and increased energy supply would be permanent. All of the claimed benefits accrue from operations. But under the CWA, the Corps must also consider persistence and permanence of the effects. 40 C.F.R. § 230.10(c).

The EA also does not provide any reasoned analysis on the balancing of costs and benefits, in violation of the CWA, which prohibits impacts to wetlands unless the Corps finds that "the benefits of the proposed alteration outweigh the damage to the wetlands resource." 33 C.F.R. § 320.4(b)(4).

In short, the Corps put a thumb on the scale by assessing benefits from operations, but not detriments. Further, the claimed benefits, in the EA, are conclusory, lacking any underlying analysis or data. The Corps' decision document does not even state the kind or amount of vessel traffic that will use the expanded Moda terminal. This is contrary to both NEPA and the CWA.

**B. The Corps failed to take a hard look at the indirect and cumulative climate impacts of the Moda Terminal expansion.**

The United States Supreme Court declared in 2007 that "the harms associated with climate change are serious and well recognized." *Massachusetts v. E.P.A.,* 549 U.S. 497, 499 (2007). NEPA requires federal agencies to analyze indirect effects, which are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R § 1508.8(b).

"The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 508 F.3d 508, 550 (9th Cir. 2007). NEPA calls for a quantification of the incremental impacts that the proposed project's emissions will have on climate change or on the environment more generally in light of other past, present, and reasonably foreseeable actions. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1216 (9th Cir. 2008). NEPA requires an analysis of the "actual environmental effects resulting from those emissions." *Id.* This principle that climate change impacts, where relevant, must be considered in NEPA analyses has been established for decades. *E.g., Border Power Plant Working Group v. Dep't of Energy*, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003).

It is also well-established that fossil fuel production, transportation, and combustion play a central role in climate change. As a consequence, federal courts

have held that in the context of fossil fuel transportation infrastructure, climate change impacts are reasonably foreseeable and must be considered in NEPA analyses. *Ctr. for Biological Diversity*, 538 F.3d at 1216; *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 73 (D.D.C. 2019).

This includes, at a minimum, downstream impacts of the fossil fuel being transported, *i.e.* impacts from end use of the fossil fuels. Courts have also held that upstream emissions of greenhouse gases must be evaluated in the NEPA analysis. *See, e.g., Sierra Club v. FERC*, 867 F.3d 1357, 1372 (D.C. Cir. 2017) (reasonably foreseeable that oil transported will be burned and contribute to climate change); *see also Utah Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.*, 528 F. Supp. 3d 1222 (D. Utah 2021) (agency calculated socioeconomic benefits of project but not socioeconomic costs of greenhouse gas emissions).

The EA acknowledges that greenhouse gas emissions can contribute to climate change, and also that emissions resulting from combustion of fossil fuels exported from the Moda Terminal are reasonably foreseeable—the EA takes the position that the Corps has no authority to regulate those emissions, and therefore, need only assess climate impacts from dredging and related construction activities occurring in the geographic area of the project. ROA.361. But the Corps' position is contrary to caselaw.

In an analogous case, *Columbia Riverkeeper v. U.S. Army Corps of Eng'rs,* No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020), the District Court considered a situation where the Corps had granted permits to authorize dredge and fill for construction of a portion of a methanol refinery and marine export facility. The Corps declined to consider greenhouse gas emissions outside Washington and part of Oregon. *Id*. at *3. The court determined the Corps' decision was arbitrary and capricious. Central to the court's reasoning was that part of the purpose of the proposed project was to ship the methanol primarily to Asia for the production of olefins. *Id*. at *4. In other words, it was not enough to consider only the local geography's contribution to global greenhouse gases, where the purpose of the project anticipated the transport and release of those greenhouse gases elsewhere.

> The Corps assertion that these greenhouse gas emissions are outside their jurisdiction does not relieve it of its duty to take a "hard look." "The fact that climate change is largely a global phenomenon that includes actions that are outside of the agency's control does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming."

*Id.* at *4 (quoting *Ctr. for Biological Diversity*, 538 F.3d at 1217).

This Moda expansion project is about expanding infrastructure necessary to accommodate an increase in deeper-draft vessels *carrying petroleum products for export*. *See* ROA.328. Therefore, not only was it reasonably foreseeable that the

Moda Expansion project would lead to an increase in greenhouse gases, the impact from combustion of these fossil fuels should have been considered.

The District Court did not directly address the line of cases regarding climate change, but generally deferred to the Corps' decision to narrow its scope based on whether the district engineer has sufficient "control and responsibility." This is contrary to the Corps' regulations, 33 C.F.R. Pt. 325, App. B, § 7, which were previously discussed and will not be repeated here. Cases addressing climate impacts offer additional guidance.

In *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017), the D.C. Court of Appeals examined *Public Citizen*, and its application of the *Public Citizen* "rule" to three recent FERC decisions licensing liquefied natural gas (LNG) terminals. *Id*. at 1372. The D.C. Court of Appeals explained that the touchstone of *Public Citizen* was that "[a]n agency has no obligation to gather or consider environmental information if it has no statutory authority *to act on that information*." *Id*. In other words, in FERC licensing decisions, the agency has no legal authority to prevent the adverse environmental effects of natural gas exports, because the agency may not consider environmental effects when acting under that narrow delegation from the Department of Energy. *Id*. at 1373. To do otherwise would have been arbitrary and capricious by relying on "factors which Congress had not intended it to consider."

But where the agency is not so limited, *Public Citizen* does not excuse an agency from considering these environmental effects. 867 F.3d at 1373. Following *Sierra Club*, because the Corps is charged under CWA with considering environmental impacts and could deny the 404 permit on the ground that the project would be too harmful to the environment, the agency is a "legally relevant cause" of the direct *and indirect* environmental effects of the project it approves, including effects on the climate. *See id*. The Corps may not, therefore, claim "jurisdictional control" and refuse entirely to assess impacts on the climate "downstream" of the Moda Expansion project.

Additionally, the Corps' limited scope is arbitrary because the EA weighed the "benefit" of increased oil production in favor of the project by finding it provided a benefit to "economics," "energy needs" and "needs and welfare of the people." ROA.359. The EA claims the project "would have economic benefits for the applicant since the applicant would be able to accommodate Suezmax vessels for the export of petroleum products" and "would also benefit the needs and welfare of the general public by increasing the supply and availability of energy." ROA.359-60. The fact that the EA cannot define a benefit separate and apart from the project's ability to increase petroleum exports demonstrates the scope of the Corps' responsibility here is much broader than construction alone.

In sum, the Corps' failure to consider reasonably foreseeable indirect and cumulative upstream and downstream impacts, including impacts to the climate, violates NEPA and the CWA and is arbitrary, capricious, and not in accordance with the law, in violation of the APA, 5 U.S.C. § 706(2)(A).

## C. The Corps failed to prepare an EIS, as required by NEPA.

To determine whether to prepare an EIS or issue a FONSI, an agency must take a "hard look" at the context and intensity of the project's potential impacts. *O'Reilly*, 2023 WL 6635070 at *1 (citing *Spiller v. White,* 352 F.3d 235, 242 (5th Cir. 2003)). NEPA regulations list several factors the Corps should have used to assess the context and intensity of the proposed Moda Expansion project. 40 C.F.R. § 1508.27(a)-(b). Based on the multiple failures to comply with NEPA, set out above, the EA was plainly inadequate to demonstrate a "hard look" at environmental consequences. The record also demonstrates that the impacts of the Moda Expansion are "significant" within the meaning of NEPA, and a full EIS must be prepared.

First, the expansion is "highly controversial" under 40 C.F.R. § 1508.27(b)(4). The Corps received approximately 80 comment letters from the general public, many of them asking for a full EIS. ROA.334, 400-533, 778 (AR.1463-67). The USEPA indicated "it was not readily evident as to . . . whether secondary/cumulative impacts were considered." ROA.341, 393. The USFWS made the same observation as to seagrasses. ROA.396-98. When other federal agencies who act as the stewards of

the resources at issue criticize the decision, that clearly indicates a project is "highly controversial." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1043 (D.C. Cir. 2021). "[A]n EIS is perhaps especially warranted where an agency explanation confronts but fails to resolve serious outside criticism, leaving a project's effects uncertain." *Id*.

The expansion proposal is also significant based on "unique characteristics of the geographic area such as…wetlands…or ecologically critical areas." 40 C.F.R. 1508.27(b)(3). The expansion will directly and indirectly impact seagrasses, a protected special aquatic site. While there is a mitigation plan for direct destruction of seagrasses, there was none for the impacts from increased vessel traffic and expanded operations. The USFWS also stated that more mitigation for direct impacts should be required. ROA.396, 775 (AR.583).

The effects of the proposed expansion are "highly uncertain," 40 C.F.R. § 1508.27(b)(5), in large part because Moda supplied no information about vessel traffic and other critical issues. The expansion is "related to other actions" like the expansion of the CCSC, which, itself, will have a significant impact on the environment. *Id*. at § 1508.27(b)(7).

The proposed project "affects public health or safety" in its light and noise impacts on the neighboring community, the possibility of oil spills, and its clear connection to climate change. *Id*. at § 1508.27(b)(2).

Each of these factors demonstrates a finding of significance under 40 C.F.R.

§ 1508.27 and demonstrates that a full EIS is required.

## CONCLUSION

For these reasons, the Court should reverse the District Court's final judgment,

vacate the 404 Permit issued by the Corps for the Moda Expansion project, and

remand to the Corps for consideration of the issues identified herein.

Respectfully submitted,

*/s/ Lauren Ice*
Lauren Ice
Texas Bar No. 24092560
Marisa Perales
Texas Bar No. 24002750
**PERALES, ALLMON & ICE, P.C.**
1206 San Antonio Street
Austin, TX 78701
(512) 469-6000 (t)
(512) 482-9346 (f)
lauren@txenvirolaw.com
marisa@txenvirolaw.com

Robert B. Wiygul
MS State Bar No. 7348
**WALTZER WIYGUL & GARSIDE LLC**
1011 Iberville Drive
Ocean Springs, MS 39564
P: (228) 872-1125
F: (228) 872-1128
robert@wwglaw.com

***Counsel for Plaintiffs-Appellants***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 8, 2024, the foregoing document was filed electronically using the Court's CM/ECF filing system and was served on all registered counsel of record in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure.

*/s/ Lauren Ice*
Lauren Ice

<u>Defendants – Appellees</u>
<u>U.S. Army Corps of Engineers et al</u>

Arielle Jeffries
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7415
Washington, DC 20044
(202) 532-3140
Arielle.Jeffries@usdoj.gov

<u>Intervenor Defendant – Appellee</u>
<u>Enbridge Ingleside Oil Terminal, LLC</u>

Jeremy C. Marwell
Vinson & Elkins, LLP
2200 Pennsylvania Ave., NW
Suite 500W
Washington, DC 20037
(202) 639-6507
jmarwell@velaw.com

Brandon M. Tuck
Vinson & Elkins, LLP
845 Texas Ave., Suite 4700
Houston, TX 77002
(713) 758-2271
btuck@velaw.com

James E. Smith
Crain, Caton & James, P.C.
1401 McKinney, Suite 1700
Houston, TX 77010
(713) 752-8620
jsmith@craincaton.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5TH CIR. R. 32.1, this document contains 12,717 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5TH CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2021 with a 14-point font named Times New Roman (with the exception of footnotes, which are in 12-point font).

*/s/ Lauren Ice*
Lauren Ice